*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

SCOTT KENNETH JONES,

Defendant-Appellant.

UNPUBLISHED
January 16, 2026
12:03 PM

No. 363291
Kalamazoo Circuit Court
LC No. 2019-001510-FC

Before: RIORDAN, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

Defendant, Scott Kenneth Jones, appeals as of right his jury trial convictions of first-degree murder, MCL 750.316(1)(a); and carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to serve life imprisonment for the first-degree murder conviction following a two-year term of imprisonment for his felony-firearm conviction. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

This case arises out of the shooting death of Antonio Reese-Manley on September 21, 2019, outside of an apartment building at the Fox Ridge apartment complex. The shooting occurred at about 7:00 a.m. at an outdoor, all-night party. Rosarah Cottle was the only witness to testify that she saw the shooting. Cottle testified that she was standing next to Reese-Manley when a person whom she knew as Sleep G fired shots at Reese-Manley at close range. Cottle maintained that she recognized defendant as the shooter because she knew him; she saw his face when the shooting occurred; and the shooter was using a crutch for support, and she knew that defendant was using crutches at that time. A video camera captured the shooting from a distance and showed that, as people scattered, presumably after shots were fired, a person using a crutch or crutches walked quickly away from the scene and got into a dark red SUV, which then drove quickly away.

Emmanuel Boyd testified that defendant, who was using crutches, paid him for a ride to Fox Ridge on the morning of the shooting, and he drove defendant there in his dark red SUV sometime between 6:00 a.m. and 7:00 a.m. Although Boyd maintained that it was not his plan to

-1-

drive defendant anywhere afterward, he testified that he nearly ran over defendant while trying to flee the gunfire, and defendant got back into his SUV before Boyd drove away.

Police officers from the Kalamazoo Department of Public Safety (KDPS) transported Reese-Manley to Bronson Methodist Hospital where he was pronounced dead. Cottle told police that Sleep G was the person who shot Reese-Manley, and she confirmed his "Sleep G Dadon" Facebook profile picture to KDPS detectives later that morning. Cottle also stated that the shooter was on crutches, and, on September 24, 2019, she identified defendant as the shooter in a photo lineup.

Someone deleted the Facebook account for Sleep G Dadon at 5:17 p.m. on the day of the shooting, but someone later set up a new Facebook account with the same e-mail address, and police traced online activity on that account to a home in Montgomery, Illinois, where defendant was living. Defendant was then extradited to Michigan to face open-murder and felony-firearm charges in this case.

At trial, over defendant's objection, the prosecutor introduced evidence that, nearly three months before Reese-Manley was killed, defendant went to Bronson Hospital after someone shot him in the leg at close range. KDPS Detective Ondreya Anderson testified that she interviewed defendant at the hospital after that shooting, and defendant refused to disclose who shot him. KDPS Officer Bradley Kendall similarly testified that defendant gave a brief statement that he was shot at a party in Kalamazoo, and defendant simply described the shooter as "cold blooded." According to Officer Kendall, defendant said that he did not want to press charges, and, referring to the shooter, defendant also said that "karma will come to him." The trial court also admitted messages from the "Sleep G Dadon" Facebook account that was traced to defendant. Defendant sent messages after he was shot in the leg, stated that he needed to find the perpetrator at Fox Ridge, and suggested that defendant planned to seek revenge when he found the shooter.

The jury found defendant guilty, and he was sentenced as described. Defendant moved for a new trial, and, following a two-day evidentiary hearing, the trial court denied defendant's motion. Defendant now appeals.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant contends that the prosecutor presented insufficient evidence of premeditation and deliberation to support his conviction of first-degree murder.

"Challenges to the sufficiency of the evidence are reviewed de novo." *People v Xun Wang*, 505 Mich 239, 251; 952 NW2d 334 (2020). "In evaluating defendant's claim regarding the sufficiency of the evidence, this Court reviews the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *Id*. (quotation marks and citation omitted).

"The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). "Premeditation and deliberation may be inferred from all the facts and circumstances, but the inferences must have support in the record and cannot be arrived at by mere speculation." *People v Plummer*, 229 Mich App 293, 301; 581 NW2d 753 (1998).

Though not exclusive, factors that may be considered to establish premeditation include the following: (1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted. [*Id*. at 300.]

The evidence presented at trial was plainly sufficient to prove premeditation and deliberation. Evidence showed that Reese-Manley was shot in the back, and Cottle testified that there was no fight or confrontation between defendant and Reese-Manley immediately before the shooting. Although defendant's Facebook messages did not directly tie him to Reese-Manley, they showed that defendant was on crutches, he suspected at least that someone from (or with ties to) Fox Ridge may have some involvement in or knowledge of the shooting in June 2019, and that he planned to kill the person who shot him. That defendant's Facebook account was deleted on the day of Reese-Manley's murder and that defendant fled the state is also evidence that defendant was conscious of guilt for his involvement in Reese-Manley's murder. See *People v Craft*, 325 Mich App 598, 612; 927 NW2d 708 (2018); *People v Sharpe*, 319 Mich App 153, 172-173; 899 NW2d 787 (2017).

Additionally, with respect to defendant's actions before and after the crime, Boyd testified that he met defendant by chance at another apartment complex, defendant offered to pay him for a ride to Fox Ridge, and Boyd planned to pick up his brother from his apartment there and leave. Boyd explained that he made a U-turn in the parking lot to get to his brother's door because his SUV could not move in reverse, and almost ran into defendant in the parking lot on his way out after the shooting However, security video of the scene showed that Boyd's SUV clearly backed out of a parking spot before making the U-turn, and shows that Boyd made the U-turn, idled in front of a group of people, and waited there until the shooting was over and defendant made his way to the SUV.

Contrary to Boyd's assertions at trial, nothing in the video indicated that he almost ran over defendant in an attempt to flee gunfire or that defendant got inside his vehicle in a panic. Instead, people appeared to scatter away from the person in a white shirt using a crutch or crutches, Boyd's vehicle sat still in a position ready to exit the area until defendant got into the SUV, and only then did Boyd drive quickly away from the scene. Viewing the video and Boyd's testimony together, the jury could infer that Boyd testified in a manner that would minimize his involvement in the crime, but that defendant paid Boyd to drive him to Fox Ridge and that Boyd also intended to drive defendant away from Fox Ridge immediately after the shooting.

Viewing the facts in a light most favorable to the prosecutor, see *Xun Wang*, 505 Mich at 251, the evidence established that defendant acted with premeditation and deliberation and any inferences were supported by the evidence. See *People v Bass*, 317 Mich App 241, 266; 893 NW2d 140 (2016).

## III.  ADMISSION OF PRIOR-ACTS EVIDENCE

Defendant next contends that the trial court erred by admitting evidence that he was shot in June 2019, as his statements after the shooting constituted impermissible prior bad-acts evidence.

"The trial court's decision whether to admit evidence is reviewed for an abuse of discretion, but preliminary legal determinations of admissibility are reviewed de novo; it is necessarily an abuse of discretion to admit legally inadmissible evidence." *People v Lowrey*, 342 Mich App 99, 108; 993 NW2d 62 (2022).

At the time of defendant's trial, MRE 404(b)(1) provided as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.[1]

"In determining the admissibility of other-acts evidence, the trial court must determine (1) whether the evidence is offered for a proper purpose under MRE 404(b), (2) whether the evidence is relevant under MRE 401 and MRE 402, and (3) whether the probative value of the evidence is substantially outweighed by unfair prejudice under MRE 403." *People v Roscoe*, 303 Mich App 633, 645-646; 846 NW2d 402 (2014). Statements reflecting a defendant's general intent are not considered as prior-acts evidence but instead as admissions of a party-opponent under MRE 801(d)(2)(A). *People v Goddard*, 429 Mich 505, 514-515, 518; 418 NW2d 881 (1988).

Consequently, evidence that defendant suffered a gunshot wound to his leg two months before Reese-Manley's homicide did not involve a prior act by defendant or anyone else. See *People v Rockwell*, 188 Mich App 405, 409-410; 470 NW2d 673 (1991). The evidence showed that defendant was the victim of a crime and also served to explain to jurors why defendant was on crutches in September 2019. But no evidence suggested that defendant committed any bad act on that occasion. That defendant was shot did not tend to suggest or establish for purposes of MRE 404(b)(1) that defendant shot someone or had a propensity to shoot someone. Further, defendant's Facebook messages, and the testimonies of Detective Anderson and Officer Kendall that defendant said that he did not want to identify the shooter or press charges, that he wanted to find the shooter, and that "karma" would come to the shooter, did not describe defendant's previous acts, but were defendant's own statements that described his intent and state of mind. See *Goddard*, 429 Mich at 515.

Defendant asserts that the trial court should have excluded the evidence because it tended to show that defendant acted in conformity with a person who is vengeful. Defense counsel did not raise this perspective of the evidence in the trial court but the position is unavailing because, again, the "prior act" was that someone shot defendant in the leg, not that defendant shot someone in revenge. Defendant's statements were not prior acts.

---

[1] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). We rely on the version of the rules in effect at the time of trial.

With respect to Detective Anderson's testimony that defendant was "uncooperative" when he did not want to press charges or for police to find the shooter, defense counsel did not object to that statement or raise any argument that this amounted to impermissible character evidence under MRE 404(b) to preserve this issue on appeal. See *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). Moreover, defendant's lack of cooperation was not presented to show that he had a character of being uncooperative with police, or that he acted in conformity with that character. Detective Anderson's description did not transform defendant's underlying statements into prior acts such that they should have been excluded under MRE 404(b)(1).

## IV. DENIAL OF COUNSEL

Defendant maintains that he was denied the assistance of counsel during the pretrial stage of the proceedings and that, under the circumstance, no attorney could provide effective assistance of counsel.

"Generally, whether a defendant's right to counsel was violated is a constitutional issue that this Court reviews de novo." *People v Hieu Van Hoang*, 328 Mich App 45, 54; 935 NW2d 396 (2019). The trial court also denied defendant relief on this issue when it denied his motion for new trial. "This Court reviews for an abuse of discretion a trial court's decision to grant or deny a motion for a new trial." *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012). "An abuse of discretion occurs when the trial court renders a decision falling outside the range of principled decisions." *Id*.

Most arguments regarding the deprivation of a defendant's constitutional right to counsel require a defendant to "show that (1) his trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Uphaus (On Remand)*, 278 Mich App 174, 185; 748 NW2d 899 (2008). In rare cases, certain circumstances are so likely to result in a constitutional violation of a defendant's right to counsel that prejudice is presumed. *United States v Cronic*, 466 US 648, 659; 104 S Ct 2039; 80 L Ed 2d 657 (1984). The *Cronic* Court described three such situations, as follows:

> Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable. . . .
>
> Circumstances of that magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial. [*Id*. at 659-660 (footnote omitted).]

Defendant contends that he was denied his right to counsel at a critical stage of the proceedings because he and defense counsel could not meet and had difficulty communicating

after his arraignment. "The pre-trial period constitutes a critical period because it encompasses counsel's constitutionally imposed duty to investigate the case and [c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Hieu Van Hoang*, 328 Mich App at 55-56 (quotation marks and citations omitted).

Defendant was arraigned on March 4, 2020, shortly before the Supreme Court issued Administrative Order No. 2020-2, 505 Mich 102 (2020), restricting trial court operations in response to the COVID-19 pandemic. Numerous Administrative Orders followed, extending restrictions on trial court operations for various periods. See *People v Witkoski*, 341 Mich App 54, 57-58; 988 NW2d 790 (2022). At the evidentiary hearing on defendant's motion for new trial, defense counsel testified that, although far from ideal during a global pandemic, she did her best to defend and uphold defendant's rights throughout her representation. Defense counsel preferred to talk to clients weekly and meet in person every other week, but that was physically impossible because defendant was housed at the Bellamy Creek Correctional Facility, which had frequently recurring, deadly outbreaks of COVID-19.

These facts do not establish that defendant experienced a complete denial of counsel such that prejudice should be presumed under *Cronic*. The record discloses that defense counsel communicated and met with defendant numerous times between his arraignment and trial and that she regularly spoke to and met with defendant in the two and a half months before his trial. This gave defendant ample opportunity to confer with counsel about the facts, evidence, and strategic decisions for counsel to fully prepare a robust defense.

Defendant further maintains that he was tried in circumstances in which no competent counsel could provide adequate assistance. See *Cronic*, 466 US at 659-660. When the *Cronic* Court recognized this deprivation of the right to counsel, it relied on cases in which counsel had little or no time to prepare for the defense in complex trials. See, e.g., *Powell v Alabama*, 287 US 45; 53 S Ct 55; 77 L Ed 158 (1932). Accepting defendant's argument would lead to the necessary conclusion that most, if not all, attorneys were incapable of providing effective assistance of counsel during the COVID-19 pandemic. To be sure, that defendant was arraigned days before COVID-19 restrictions were put in place caused delays and communication difficulties. Nonetheless, the circumstances were not such that defense counsel was prevented from adequately preparing and defending his case and defendant is not entitled to automatic relief under *Cronic*.

## V. DENIAL OF RIGHT TO SPEEDY TRIAL

For similar reasons, defendant contends that he was denied his constitutional right to a speedy trial because in his view most of the delays in his case are attributable to the prosecutor.

"Whether a defendant was denied his constitutional right to a speedy trial is a mixed question of fact and law." *People v Gilmore*, 222 Mich App 442, 459; 564 NW2d 158 (1997). This Court reviews a trial court's factual findings under the clearly erroneous standard and constitutional questions of law de novo. *Id*.

Both the United States and Michigan Constitutions guarantee criminal defendants the right to a speedy trial. US Const, Am VI; Const 1963, art 1, § 20.

"[A] defendant's right to a speedy trial is not violated after a fixed number of days." *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006). Rather, when evaluating a speedy-trial claim, the reviewing court is required to balance four factors: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Id*. at 261-262. "Following a delay of eighteen months or more, prejudice is presumed, and the burden shifts to the prosecution to show that there was no injury." *Id*. at 262. [*People v Smith*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 362114); slip op at 3 (footnote omitted).]

It is undisputed that defendant was arrested in this case on January 22, 2020; he was arraigned on March 4, 2020; his preliminary examination occurred on September 17, 2021; and his trial began on July 21, 2022. On the basis of those dates, defendant's trial took place nearly 30 months after his arrest.

On the cause of the delay, although defendant and the prosecutor agree that some delays were caused by the COVID-19 pandemic, defendant contends that 23 months of delays should be attributed to the prosecutor, but this vastly understates the impact the COVID-19 pandemic had on the adjournments. The prosecutor concedes that the delay between defendant's arrest and his arraignment should be attributed to the prosecutor. However, following defendant's arraignment in March 2020, there were numerous adjournments of his preliminary examination because of pandemic-related safety precautions and restrictions. Defendant asserts that the 12-month delay from June 3, 2020 to June 21, 2021, should be attributed to the prosecutor because the district court did not comply with the State Court Administrative Office order to conduct preliminary examinations by video hearing and the Michigan Department of Corrections (MDOC) did not comply with orders to transport defendant to court.

Defense counsel testified that, as a parole absconder, defendant was held at Bellamy Creek instead of the Kalamazoo County jail from June 8, 2020 to October 26, 2021. She further testified that Bellamy Creek had such a severe problem with cases of COVID-19 that it was often on lockdown or the MDOC would not transport prisoners from the facility when positive cases of COVID-19 were dangerously high. Although defendant urges this Court to weigh this factor against the prosecutor, as this Court concluded in *Smith*, ___ Mich App at ___; slip op at 1, "[t]he government simply cannot be faulted for a highly contagious and mutating virus." (Quotation marks and citation omitted.)

Although she knew that the MDOC was not allowing prison transports from Bellamy Creek because of conditions related to the pandemic, defendant's trial counsel stated that she would not participate in the offer of a remote preliminary examination. Defendant complains that it was the MDOC's decision to house him at Bellamy Creek and that any related delays should be attributed to the prosecutor. Defendant provides no factual or legal authority to show that defendant should have been held elsewhere when he was arrested for open murder while on parole for another felony conviction. Because defendant concedes that transportation problems continued until June 2021, and no evidence suggests that the problems were related to anything other than the COVID-19 pandemic, delays between June 2020 and June 2021 are not attributed to the government pursuant to the holding in *Smith*.

-7-

Defendant argues that one delay was caused by a judge covering a different docket, but he does not dispute that this was caused by the unexpected retirement of another judge. However, "[a] delay which results from short-term docket congestion, attributable to exceptional circumstances which hamper the normally efficient functioning of the trial court, constitutes an excusable delay." *People v Schinzel (On Remand)*, 97 Mich App 508, 511-512; 296 NW2d 85 (1980). And, although defendant contends that trial was delayed without explanation for approximately five months between January 2022 and May 2022, at the evidentiary hearing, defense counsel agreed that jury trials were paused in Kalamazoo County in early 2022 because of high COVID-19 levels. Again, pursuant to *Smith*, ___ Mich App at ___; slip op at 5, delay caused by the COVID-19 pandemic are not attributable to the prosecution.[2]

The record reflects that the vast majority of delays in defendant's case were caused by the COVID-19 pandemic or did not weigh against either party.

With regard to the defendant's assertion of his right to a speedy trial, it is undisputed that defendant asserted his right to a speedy trial early and often, so this factor weighs in his favor. See *Barker v Wingo*, 407 US 514, 532; 92 S Ct 2182; 33 L Ed 2d 101 (1972).

To weigh the prejudice to a defendant because of delays, this Court explained in *People v Jones*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 365590); slip op at 5:

> "There are two types of prejudice which a defendant may experience, that is, prejudice to his person and prejudice to his defense." *People v Collins*, 388 Mich 680, 694; 202 NW2d 769 (1972). "Prejudice to his person would take the form of oppressive pretrial incarceration leading to anxiety and concern. Prejudice to his defense might include key witnesses being unavailable. Impairment of defense is the most serious." *Id*. "Every incarceration results in a degree of prejudice to the person." *Id*. We look to whether the ability to defend oneself "was in any significant way prejudiced." *People v Chism*, 390 Mich 104, 115; 211 NW2d 193 (1973).

The prosecutor concedes that defendant suffered some personal prejudice by being incarcerated and exposed to repeated COVID-19 outbreaks at Bellamy Creek. Defendant asserts that his defense was prejudiced by the delay of his trial. As discussed, prejudice is presumed because the delay lasted longer than 18 months, and the burden, therefore, shifted to the prosecutor to show that defendant did not suffer any injury. See *Williams*, 475 Mich at 262. Defendant emphasizes that the delay interfered with trial preparation and that he lost the opportunity to present the testimony of Mark Ford because Ford moved to another state before trial.

---

[2] Defendant argues that the adjournment of defendant's trial from May 2022 to July 2022 should be weighed against the prosecutor because the prosecutor had a health issue that prevented him from being able to try the case. Under these circumstances, a delay caused by a medical problem of the prosecutor who handled the case from the outset justified the delay. *Barker v Wingo*, 407 US 514, 531; 92 S Ct 2182; 33 L Ed 2d 101 (1972).

We see no reason that any delay prevented Ford from testifying at trial. Ford was a close friend of defendant, and he testified that he maintained contact with defendant through the hearing on defendant's motion for new trial. Ford also admittedly did not see the shooting, and did not speak to Cottle until well after defendant's trial. Defendant has not established that any delays prejudiced his case in this regard. Other than general claims about communicating with defense counsel, defendant does not otherwise argue that any of his witnesses were unavailable or unreachable because of the delay. Accordingly, the prosecutor has overcome the presumption that defendant's trial was prejudiced because of the delay in his trial, and the weight of the factors did not justify granting defendant a new trial because of the denial of his right to a speedy trial.

Defendant contends in the alternative that, to the extent that defense counsel appeared to stipulate or acquiesce to the adjournments, it constituted ineffective assistance of counsel. As this Court explained in *In re LT*, 342 Mich App 126, 133-134; 992 NW2d 903 (2022):

> The Sixth Amendment of the United States Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." See also Const 1963, art 1, § 20. "The right to counsel also encompasses the right to the effective assistance of counsel." *People v Pubrat*, 451 Mich 589, 594, 548 NW2d 595 (1996).

> "To establish ineffective assistance of counsel, defendant must first show that (1) his trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Uphaus (On Remand)*, 278 Mich App 174, 185; 748 NW2d 899 (2008). "Effective assistance of counsel is presumed and defendant bears the burden of proving otherwise." [*People v*] *Petri*, 279 Mich App [407, 410; 760 NW2d 882 (2008)].

"The question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012).

As discussed, defense counsel was placed in the difficult position of rendering effective assistant to defendant during a global pandemic. Defense counsel's e-mails with the MDOC, the courts, and the prosecutor show that she did not insist upon moving forward when courts were shut down or other emergency protective measures were taken to protect the public during the pandemic. Defense counsel was a seasoned attorney and chief defender of the Kalamazoo Public Defender's Office. The record does not disclose that defense counsel could have done much to move defendant's case forward when courts were simply not conducting hearings or trials for long periods during the pendency of his case and when safety precautions related to the pandemic were in place. Further, defense counsel believed, and it was the policy of the defender's office, that, to provide effective assistance, defendants should be physically present for preliminary examinations. That defense counsel demanded that right at the expense of a speedier trial was a matter of sound trial strategy. Particularly when it was difficult to communicate with defendant during some lockdowns at Bellamy Creek, it is apparent that defense counsel saw the importance of being able to personally confer with defendant during the preliminary examination to discuss

the testimony and witnesses and decide matters of trial strategy. See *In re LT*, 342 Mich App at 133-134.

## VI. JUROR MISCONDUCT

For the first time on appeal, defendant argues that he was denied a fair trial because a juror was not made an alternate after she fell asleep during the testimony of a prosecution witness.

Defendant failed to preserve this issue by raising it in his motion for new trial. *People v Benberry*, 24 Mich App 188, 191-192; 180 NW2d 391 (1970). This Court reviews unpreserved constitutional arguments under the plain error rule. *People v Abraham*, 256 Mich App 265, 274-275; 662 NW2d 836 (2003). To establish plain error, "the defendant must establish that an error occurred, that the error was plain, i.e., clear or obvious, and that the plain error affected substantial rights." *People v Lockridge*, 498 Mich 358, 392-393; 870 NW2d 502 (2015). "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (quotation marks and citation omitted).

An allegation of juror misconduct, even if the alleged misconduct did actually occur, will not warrant a new trial unless the party seeking the new trial can show that the misconduct [was] such as to affect the impartiality of the jury or disqualify them from exercising the powers of reason and judgment. [*People v Dunigan*, 299 Mich App 579, 586; 831 NW2d 243 (2013) (quotation marks and citation omitted).]

If the record does not disclose what testimony the juror missed, and if the defendant does not show how he or she was prejudiced, then the assertion that a juror slept through trial testimony is not enough to warrant a new trial. *Id*.

At a bench conference, defense counsel noted that a juror fell asleep during the testimony of crime scene specialist Gary Latham. Most of the bench conference was not transcribed because it was inaudible. Of the existing transcript, it appears that the trial court did not see the juror sleeping, and the record does not reflect that the parties came to any agreement with the trial court about how they would proceed. Although making the juror an alternate was raised, the record does not disclose that the trial court ruled that the juror would be made an alternate. Rather, it was equally likely from the transcript that counsel and the trial court agreed that they would consider the issue further if the problem continued. Defendant has not shown that the juror falling asleep during the beginning of Latham's testimony, which contained little to no substantive evidence, was sufficient to affect the impartiality of the jury or its powers of reason or judgment. See *Dunigan*, 299 Mich App at 586.

## VII. DISCLOSURE OF IMPEACHMENT EVIDENCE

Defendant next argues that the prosecutor violated *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), by not disclosing two of Cottle's prior convictions that could have been used to impeach her testimony. This Court "reviews due process claims, such as

allegations of a *Brady* violation, de novo." *People v Dimambro*, 318 Mich App 204, 212; 897 NW2d 233 (2016) (quotation marks and citation omitted).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *People v Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2013) (quotation marks and citation omitted). "To establish a *Brady* violation, a defendant must show that: '(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material.' " *People v Christian*, 510 Mich 52, 76; 987 NW2d 29 (2022), quoting *Chenault*, 495 Mich at 150.

The duty under *Brady* to disclose evidence applies to both exculpatory or impeaching evidence and it applies even if the information is only known to police, and not the prosecutor. *Youngblood v West Virginia*, 547 US 867, 869-870; 126 S Ct 2188; 165 L Ed 2d 269 (2006); *People v Brownridge (On Remand)*, 237 Mich App 210, 214; 602 NW2d 584 (1999). The parties largely agree that both of Cottle's prior convictions contained an element of dishonesty that could have been used for impeachment under MRE 609(a).

But even assuming that the prosecutor had a duty to disclose Cottle's two convictions involving dishonesty, defendant is not entitled to relief under *Brady* because, as the trial court correctly ruled, the evidence was not material. As stated in *Christian*, 510 Mich at 76:

> To establish that exculpatory evidence is material, a defendant must show that " 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " [*Chenault*, 495 Mich at 150], quoting *Bagley*, 473 US at 682. A "reasonable probability" means " 'a probability sufficient to undermine confidence in the outcome.' " *Chenault*, 495 Mich at 150, quoting *Bagley*, 473 US at 682 (opinion of Blackmun, J.). A defendant need not "demonstrat[e] by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." *Kyles v Whitley*, 514 US 419, 434; 115 S Ct 1555; 131 L Ed 2d 490 (1995). Rather, the relevant question is whether the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. [Second alteration and ellipsis in original.]

Defendant accurately observes that, as the only person testifying about who shot Reese-Manley, Cottle was a crucial witness and evidence that tended to undermine her credibility was particularly important for the defense. However, as the trial court observed, defense counsel undermined Cottle's credibility at trial in numerous other ways, including by emphasizing her drunkenness and use of drugs; questioning her memory of the incident, defendant's clothing, and of talking to police; suggesting that she lied at the preliminary examination; pointing to conflicts in her testimony and statements to police; suggesting that she had knowledge of another person who could have shot Reese-Manley; suggesting that video evidence of her appeared to show she may have been involved in the crime; and presenting testimony of her sometime romantic partner who testified that she lied repeatedly and told him she lied about defendant's involvement in Reese-Manley's murder.

Notwithstanding defense counsel's rigorous cross-examination of Cottle, the jury apparently believed her testimony that defendant was the person who shot Reese-Manley, which was corroborated by physical evidence and a video recording. Evidence that Cottle may have obtained money through dishonesty or lied about her name to police in another incident was not material to her ability to identify Reese-Manley's shooter. The verdict was worthy of confidence because it was supported by ample corroborating evidence. See *Christian*, 510 Mich at 76. For a similar reason, defendant cannot show that defense counsel denied him his right to the effective assistance of counsel for failing to impeach Cottle with the two convictions because defendant cannot show that "there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *Uphaus*, 278 Mich App at 185.

## VIII.  NEWLY DISCOVERED EVIDENCE

Defendant argues that he is entitled to a new trial because of newly discovered evidence from witnesses Jerry Blackwell, Mark Ford, and Spencer Marbley.

> For a new trial to be granted on the basis of newly discovered evidence, a defendant must show that: (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial. [*People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003) (quotation marks and citations omitted).]

## A. BLACKWELL

Jerry Blackwell testified at trial that Cottle told him that she lied about defendant's involvement in Reese-Manley's shooting, and he also maintained, contrary to Cottle's testimony, that he and Cottle were in a romantic relationship and intended to get married. On cross-examination, Blackwell conceded that he and Cottle had an "on and off" relationship and went long periods without communicating. At the evidentiary hearing, Blackwell testified that, after defendant's trial, Cottle sent him a message stating that she did not testify that they were not together, but that she never told him that she lied on the stand or that she intended to change her story. Blackwell further testified that Cottle sent him another message in February 2023 that she was sad that they were no longer together.

Defendant is correct that the messages offered through Blackwell were newly discovered because Blackwell received them after defendant's trial, so counsel also could not be expected to have discovered them with reasonable diligence. See *Cress*, 468 Mich at 692. "In examining whether this 'new evidence makes a different result probable on retrial,' the trial court must consider the evidence that was previously introduced at trial." *People v Johnson*, 502 Mich 541, 571; 918 NW2d 676 (2018), quoting *Cress*, 468 Mich at 692. As discussed, Blackwell and Cottle already differed in their trial testimonies about the status of their relationship, so those references would be cumulative of other testimony. Cottle's first message reaffirmed her trial testimony that she never told Blackwell that she lied about the crime. If anything, the message would bolster Cottle's trial testimony that defendant shot Reese-Manley and the new evidence would not make

"a different result probable on retrial." *Johnson*, 502 Mich at 571 (quotation marks and citation omitted).

## B. FORD

As discussed, defendant argued that counsel could have called Ford to testify if not for the delays in his trial. After trial, Ford testified that he saw Cottle in June 2023, and she recanted her trial testimony. Because of the timing of the conversation, Ford's statement would qualify as newly discovered because he did not talk to Cottle until nearly a year after defendant's trial. See *Cress*, 468 Mich at 692. For the same reason, Ford's statement that Cottle said that she did not see defendant shoot Reese-Manley and did not testify that way at trial could not have been discovered at the time of defendant's trial. See *id*.

But the trial court found that Ford's testimony lacked credibility because he was a lifelong friend of defendant's and a reasonable juror would not believe his assertion about Cottle's recantation. "In order to determine whether newly discovered evidence makes a different result probable on retrial, a trial court must first determine whether the evidence is credible." *Johnson*, 502 Mich at 566-567. The trial court's conclusion should focus on "whether a *reasonable juror* could find the testimony credible on retrial." *Id*. at 567.

Ford's testimony was straightforward and primarily focused on Cottle volunteering "that [defendant] did not shoot anyone and she didn't see him shoot nobody and she says she didn't testify and say that." He also testified that he was good friends with defendant, their friendship was well-known in the community, defendant had a key to his apartment, and Ford remained in contact with defendant. Pursuant to Johnson, the trial court properly focused on whether a reasonable juror would find Ford's testimony credible and ruled in the negative. This was not clearly erroneous. When "newly discovered evidence takes the form of recantation testimony, it is traditionally regarded as suspect and untrustworthy." *People v Canter*, 197 Mich App 550, 559; 496 NW2d 336 (1992).

## C. MARBLEY

At the evidentiary hearing, Spencer Marbley testified that Cottle was his adopted sister and that she told him in a phone call to him in prison that she assumed defendant was the shooter because he and Reese-Manley had a previous altercation. From prison phone records, there was no evidence that the phone conversation Marbley described could have occurred. During his testimony, Marbley also conceded that Blackwell and he met with defendant in prison to "clear the air" because Cottle testified against defendant at trial. According to Marbley, he contacted defendant's appellate counsel and testified at the evidentiary hearing because he thought he "was righting a wrong."

Marbley's testimony could be considered newly discovered evidence because Marbley testified that he met defendant after the trial and only then did it occur to him to call defendant's appellate counsel to tell him about his phone call with Cottle. But the trial court again concluded that no reasonable juror would find Marbley's testimony was worthy of belief on retrial. The trial court found that Marbley's testimony was plainly influenced by his fear of defendant, as Marbley himself testified that he and his family's safety was at risk if someone in the family "snitched."

-13-

Under the circumstances, and because phone records showed that no such call occurred, the trial court's conclusion that Marbley's testimony lacked credibility was not clearly erroneous.

Marbley's testimony was not likely to change the verdict on retrial for other reasons. See *Cress*, 468 Mich at 692. Cottle merely told Marbley that she "assumed" that defendant shot Reese-Manley because the two had a previous altercation and defendant was at Fox Ridge on the night of the crime. Again, video and other evidence corroborated her testimony that defendant shot Reese-Manley. Indeed, Marbley's testimony would arguably strengthen the prosecutor's case because, according to Marbley, Cottle disclosed that defendant and Reese-Manley had a previous altercation, which gave defendant a motive to kill him.

## IX. LOAN APPLICATIONS AND REQUEST FOR COUNSEL

Defendant maintains that other newly discovered evidence showed that Cottle committed fraud in two loan applications and, as a result, also provided false information in a request for the appointment of counsel or that defense counsel was ineffective for failing to find and present the evidence.

We hold that the trial court did not abuse its discretion by concluding that defendant was not entitled to a new trial on the ground of newly discovered evidence. Defendant did not establish through documentation or testimony that the evidence was "newly discovered" or when it could be found with reasonable diligence. A witness referred to an unspecified court ruling that the loan information should be made public but, beyond the fact that the applications bore dates in April 2021 and that the defense found the applications in fall 2023, defendant provided no evidence to show when the information was made public or when the documents with Cottle's name were available to the public. For that reason, defendant has not shown that the evidence was "newly discovered" and that it could not have been discovered and produced at his trial in July 2022 through reasonable diligence. See *Cress*, 468 Mich at 692.

For the same reason, defendant cannot show that defense counsel's failure to locate this evidence fell below an objective standard of reasonableness under prevailing professional norms. See *Uphaus*, 278 Mich App at 185. Because defendant failed to prove the first prong of an ineffective assistance of counsel argument, we need not further address the issue.[3]

Affirmed.

/s/ Michael J. Riordan
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado

---

[3] We also reject defendant's argument that the cumulative effect of several errors denied him a fair trial. See *People v Mayhew*, 236 Mich App 112, 128; 600 NW2d 370 (1999).